# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

HARTMAN UNDERHILL & BRUBAKER LLP
By:  Kevin M. French, Esquire
Attorney ID No. 47589
Brett D. Jackson, Esquire
Attorney ID No. 87517
221 East Chestnut Street             Attorneys for Plaintiff
Lancaster, PA  17602                 REVA River Plaza, LLC
(717) 299-7254(phone)/(717) 299-3160 (fax)

| | | |
|---|---|---|
| REVA RIVER PLAZA, LLC, | : | CIVIL ACTION |
| authorized agent for: REVA RIVER | : | |
| PLAZA TIC 1, LLC; REVA RIVER | : | NO. CI-08-_____ |
| PLAZA TIC 2, LLC; REVA RIVER | : | |
| PLAZA TIC 3, LLC; REVA RIVER | : | |
| PLAZA TIC 4, LLC; REVA RIVER | : | |
| PLAZA TIC 5, LLC; REVA RIVER | : | |
| PLAZA TIC 6, LLC; REVA RIVER | : | |
| PLAZA TIC 7, LLC; REVA RIVER | : | |
| PLAZA TIC 8, LLC; REVA RIVER | : | |
| PLAZA TIC 9, LLC; REVA RIVER | : | |
| PLAZA TIC 10, LLC; REVA | : | |
| RIVER PLAZA TIC 11, LLC; | : | |
| REVA RIVER PLAZA TIC 12, | : | |
| LLC; REVA RIVER PLAZA TIC | : | |
| 13, LLC; REVA RIVER PLAZA | : | |
| TIC 14, LLC; REVA RIVER | : | |
| PLAZA TIC 15, LLC; REVA | : | |
| RIVER PLAZA TIC 16, LLC; | : | |

REVA RIVER PLAZA TIC 17,          :
LLC; REVA RIVER PLAZA TIC         :
18, LLC; REVA RIVER PLAZA         :
TIC 19, LLC; REVA RIVER           :
PLAZA TIC 20, LLC; REVA           :
RIVER PLAZA TIC 21, LLC;          :
REVA RIVER PLAZA TIC 22,          :
LLC; and REVA RIVER PLAZA         :
TIC 23, LLC                       :
           Plaintiff               :
                             :
       v.                    :
                             :
RIVER HOUSE ASSOCIATES,           :
L.P.; WEST RITTENHOUSE            :
MANAGEMENT COMPANY,               :
LLC; BRADLEY J. KORMAN; and,      :
KATHY PARISI,                     :
        Defendants           :   JURY TRIAL DEMANDED

## <u>COMPLAINT</u>

1.    Plaintiff, REVA River Plaza, LLC ("REVA"), is a limited liability company organized and existing under the laws of Delaware, having a registered address c/o Harvard Business Services, Inc., 16192 Coastal Highway, Lewes, Delaware 19958.

2.    REVA is the authorized agent for REVA River Plaza TIC 1, LLC; REVA River Plaza TIC 2, LLC; REVA River Plaza TIC 3, LLC; REVA River Plaza TIC 4, LLC; REVA River Plaza TIC 5, LLC; REVA River Plaza TIC 6, LLC; REVA River Plaza TIC 7, LLC; REVA River Plaza TIC 8, LLC; REVA River Plaza TIC 9, LLC; REVA River Plaza TIC 10, LLC; REVA River Plaza TIC

11, LLC; REVA River Plaza TIC 12, LLC; REVA River Plaza TIC 13, LLC; REVA River Plaza TIC 14, LLC; REVA River Plaza TIC 15, LLC; REVA River Plaza TIC 16, LLC; REVA River Plaza TIC 17, LLC; REVA River Plaza TIC 18, LLC; REVA River Plaza TIC 19, LLC; REVA River Plaza TIC 20, LLC; REVA River Plaza TIC 21, LLC; REVA River Plaza TIC 22, LLC; and REVA River Plaza TIC 23, LLC (collectively, the "REVA River Plaza TICs").  Each of the REVA River Plaza TICs are limited liability companies organized and existing under the laws of Delaware, each having a registered address c/o Harvard Business Services, Inc., 16192 Coastal Highway, Lewes, Delaware 19958.

3.      Defendant, River House Associates, L.P. ("RHA"), is a Pennsylvania limited partnership, having a registered address c/o Korman Communities, Inc., 2 Neshaminy Interplex, Suite 303, Trevose, Pennsylvania 19053.

4.      Defendant, West Rittenhouse Management Company, LLC ("WRMC"), is a Pennsylvania limited liability company, having a registered address c/o Korman Communities, Inc., 2 Neshaminy Interplex, Suite 303, Trevose, Pennsylvania 19053.  WRMC is RHA's general partner.

5.      Defendant, Bradley J. Korman ("Korman") is an adult individual and Pennsylvania resident, having a principal business address at 222 West Rittenhouse Square, Philadelphia, Pennsylvania 19103-5705.  Korman is an officer and member of WRMC.

6.     Defendant, Kathy Parisi ("Parisi") is an adult individual and Pennsylvania resident having a principal business address at 222 West Rittenhouse Square, Philadelphia, Pennsylvania  19103-5705.  Parisi is employed by Korman Communities, Inc., a Pennsylvania corporation, as its Regional Property Manager.

## JURISDICTION AND VENUE

7.     Jurisdiction is proper under 28 U.S.C. § 1332 because the parties are of diverse citizenship, and the amount in controversy, exclusive of interest and costs, is in excess of Seventy-five Thousand Dollars ($75,000).  Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(2).

## FACTUAL BACKGROUND

8.     In September, 2007, Real Estate Value Advisors, LLC, a Virginia limited liability company, and RHA entered into a Purchase and Sale Agreement (the "Purchase Agreement"), under which Real Estate Value Advisors agreed to purchase from RHA certain real property with improvements located within the City of Harrisburg, County of Dauphin, Pennsylvania, having an address of 2311 North Front Street, Harrisburg, Pennsylvania, consisting of a 271 unit apartment complex commonly known as the River Plaza Apartments (the "River Plaza Apartments").  A true and correct copy of the Purchase Agreement (and any and all amendments thereto) is attached hereto as Exhibit A and incorporated by reference.

9.      Under the Purchase Agreement, Real Estate Value Advisors also was to purchase from RHA all existing contracts, personal property, equipment, supplies and fixtures and intangible property owned by RHA and related to and/or associated with the River Plaza Apartments and/or the operation thereof.  *See* Exhibit A (Section 2).

10.     On December 28, 2007, Real Estate Value Advisors assigned to REVA all of its rights under the Purchase Agreement and Closing on the sale of the River Plaza Apartments to REVA occurred on December 31, 2007 (the "Closing").  A true and correct copy of the Assignment, dated December 28, 2007, by and between Real Estate Value Advisors and REVA is attached hereto as Exhibit B and incorporated by reference.

11.     Shortly after the Closing, REVA discovered that RHA and its agents engaged in a pattern of fraud and misrepresentation designed to defraud REVA, fraudulently induce it to enter into the Purchase Agreement and to consummate the purchase of the River Plaza Apartments.

12.     As set forth more fully below, RHA and its agents intentionally withheld from REVA certain material information regarding the physical condition of the River Plaza Apartments.

13.     As set forth more fully below, RHA and its agents also affirmatively misrepresented the physical condition of the River Plaza Apartments.

14.    As set forth in detail below, RHA and its agents intentionally withheld information regarding and affirmatively misrepresented:

(a)    the existence and terms of contracts to be assumed by REVA in connection with the purchase of the River Plaza Apartments;

(b)    the existence of building code (the "Code") violations at the River Plaza Apartments at the time of Closing;

(c)    the condition of the roof of the River Plaza Apartments; and,

(d)    the existence of fire code (the "Fire Code") violations at the River Plaza Apartments at the time of Closing.

**RHA's and Korman's Intentional and Knowing Failure to Disclose and Affirmative Misrepresentations Regarding Existing Contracts**

15.    The Purchase Agreement required RHA to provide a complete list of all existing contracts associated with or relating to the River Plaza Apartments.  *See* Purchase Agreement, Section 7(a)(vii) and Schedule E thereto.

16.    In the Purchase Agreement, RHA represented and warranted that it provided to REVA correct and complete copies of all of such contracts.  *See* Purchase Agreement, Section 5(f).

17.    Despite these representations and warranties, RHA and Korman intentionally failed and refused to provide true and complete copies of at least two separate existing agreements affecting the River Plaza Apartments.

18.    On or before the Closing, RHA provided to REVA copies of: (a) a Lease Agreement, dated May 6, 1999, between Coinmach Corporation ("Coinmach") and RHA (the "Coinmach Lease"); and, (b) a Contracted Full

Preventive Elevator Maintenance Agreement between Block Elevator Company

("Block") and RHA (as successor to the previous party thereto, River Plaza) (the

"Block Agreement").  True and correct copies of the Coinmach Lease and the

Block Agreement are attached as Exhibits C and D hereto, respectively, and

incorporated herein by reference.

19.     The terms of the Coinmach Lease and the Block Agreement, as

provided to REVA, indicated that the initial terms of both agreements,

respectively, had expired and that both agreements were terminable upon thirty

(30) days' written notice.

20.     RHA, through its agent, Korman, misrepresented to REVA that both

agreements were terminable upon thirty (30) days' written notice.

21.     Despite RHA's and Korman's representations to the contrary, after

Closing REVA discovered that the terms of both agreements had been extended by

RHA prior to Closing and with respect to the Coinmach Lease, RHA had received

undisclosed payments totaling $40,000.

22.     RHA and Korman were fully aware of, but intentionally failed to

disclose to REVA, the extension of the respective terms of the Coinmach Lease or

the Block Agreement.

## The Coinmach Lease

23.     The Coinmach Lease permitted Coinmach to occupy the laundry room facilities located in the River Plaza Apartments and obligated Coinmach to provide appropriate coin operated laundry equipment available for use by the residents of the River Plaza Apartments.  *See* Exhibit C, Sections 1 and 3.

24.     The copy of the Coinmach Lease provided to REVA by RHA reflected a seven (7) year term, commencing on February 1, 1999.

25.     Following the expiration of the initial seven (7) year term, the Coinmach Lease automatically renewed for successive month-to-month periods, until written notice of termination was provided by either party at least thirty (30) days prior to the expiration of the then-existing term.  *See* Exhibit C, Section 1.

26.     Under the Coinmach Lease, RHA was entitled to receive as rent an amount equal to sixty percent (60%) of the total proceeds collected by Coinmach from the operation of the laundry equipment located at the River Plaza Apartments.

27.     Prior to Closing, Korman, acting on behalf of RHA, represented to REVA that the Coinmach Lease was a month-to-month lease term which could be terminated upon thirty (30) days' written notice.

28.     After Closing, having been advised by its property manager, Lincoln Property Company ("Lincoln"), of past problems encountered with the services provided by Coinmach, REVA decided to terminate the Coinmach Lease.

29.     In reliance upon the copy of the Coinmach Lease provided by RHA and of Korman's representations regarding the termination of such Lease, in January, 2008, REVA provided Coinmach with notice of its intention to terminate the Coinmach Lease.

30.     Coinmach refused to terminate the Coinmach Lease and informed REVA that RHA had previously extended the term of the Coinmach Lease through January 31, 2012.

31.     As evidence of the extension, Coinmach provided REVA with a copy of the written lease extension (the "Coinmach Lease Extension") executed by RHA and dated September 8, 2004.  A true and correct copy of the Coinmach Lease Extension is attached as Exhibit E hereto and incorporated herein by reference.

32.     The Coinmach Lease Extension also reduced the payments by Coinmach from sixty percent (60%) of the total proceeds collected from the operation of the laundry equipment to fifty percent (50%) of such proceeds.

33.     As consideration for reducing the rental rate charged to Coinmach, RHA received two payments consisting of: (a) a $10,000 advance commission payment; and (b) a $30,000 lease bonus (collectively, the "Coinmach Advances"). *See* Exhibit E, Section 2.

34.     The Coinmach Lease Extension required RHA to return a pro-rata share of the Coinmach Advances in the event RHA (and/or its successor) terminated the Coinmach Lease prior to the end of the extension term.

35.     Despite its knowledge of the Coinmach Lease Extension and despite its receipt of the financial benefits flowing from that extension (*i.e.*, the Coinmach Advances), RHA and Korman intentionally failed to disclose to REVA the existence of the Coinmach Lease Extension and did not provide REVA with a copy of the Coinmach Lease Extension.

36.     In addition, RHA failed to disclose to REVA: (a) the reduction of the rental rate charged to Coinmach: and (b) RHA's receipt of the Coinmach Advances.

37.     As successor to RHA under the Coinmach Lease and the Coinmach Lease Extension, RHA's undisclosed extension obligated REVA to perform under a contract which it understood could be readily terminated.

38.     RHA's failure to disclose the existence of the Coinmach Lease Extension forced REVA to utilize Coinmach's services at a decreased rental rate (*i.e.*, profit to REVA as landlord) and obligated REVA to repay a pro-rata portion of the Coinmach Advances despite the fact that REVA received no part of such advances.

39.     Upon discovering the Coinmach Lease Extension, REVA demanded that RHA terminate the Coinmach Lease.

40.     To date, RHA has failed and/or refused to: (a) terminate the Coinmach Lease; or (b) make payment to REVA in the amount of Twenty-seven Thousand Two Hundred Twenty-two Dollars ($27,222), representing the pro-rata portion of the Coinmach Advances as of December 31, 2007.

41.     RHA has also failed to compensate REVA for its unexpected losses incurred as a result of the reduction of the rental rate from 60% to 50% of the proceeds collected by Coinmach.

**<u>The Block Agreement</u>**

42.     REVA also intended to terminate the Block Agreement in favor of another vendor.

43.     Based upon the copy of the Block Agreement provided by RHA and representations made by Korman, REVA believed that the Block Agreement could be terminated upon thirty (30) days' written notice.

44.     REVA contacted Kone, Inc. ("Kone"), Block's successor, and learned that RHA had executed a separate agreement with Kone (the "Kone Contract"), the term of which commenced on December 1, 2005 and ran through December 1, 2008.  A true and correct copy of the Kone Agreement is attached hereto as Exhibit F and incorporated herein by reference.

45.     Pursuant to the Kone Contract, as RHA's successor, REVA was required to fulfill RHA's obligations under the Kone Contract for the remaining balance of the term.

46.     If REVA terminated the Kone Contract prior to December 31, 2008, or failed to fulfill RHA's obligations thereunder, REVA would be forced to pay all remaining amounts due until the end of the term.

47.     REVA immediately contacted RHA regarding its failure to disclose the existence of the Kone Contract and demanded that RHA terminate the Kone Contract.

48.     To date, REVA has not received confirmation from RHA or Kone that the Kone Contract has been terminated.

### RHA's, Korman's and Parisi's Failure to Disclose and Affirmative Misrepresentations Regarding the Existence of Code Violations

49.     Prior to Closing, RHA provided to REVA a copy of a report dated November 1, 2007 (the "Inspection Report"), compiled by the City of Harrisburg's Department of Building and Housing Development, Bureau of Codes (the "Codes Bureau"), following an inspection of the River Plaza Apartments.

50.     The Codes Bureau inspected thirty-nine (39) of the two hundred seventy-one (271) units and found numerous and extensive Code violations.  A true and correct list of the Code violations noted in the Inspection Report and a

copy of the Inspection Report are attached hereto as Exhibits G and H, respectively, and are incorporated herein by reference.

51.     The Codes Bureau required RHA to correct all Code violations noted in the Inspection Report within 30 days and further required RHA to check all two hundred seventy-one (271) units for "similar violations" and correct those as well. *See* Exhibit H, p. 10.

52.     With regard to any and all existing Code violations concerning electrical fixtures or devices, the Codes Bureau required all such corrections to be "accomplished by a Harrisburg Licensed Electrician . . . under proper permit." *See* Exhibit H, p. 11.

53.     The Codes Bureau also required RHA to execute and file a Self-Inspection Report and Affidavit (the "Self-Inspection Affidavit") attesting and affirming that all existing code violations at the River Plaza Apartments had been corrected.

54.     The Self-Inspection Affidavit included the following statement:

> Failure to submit this document on or before the time indicated above will result in decisive legal action.  Submission of a false statement to a public official, pursuant to Section 4904 of Title 18 of the Pennsylvania Crimes Code, constitutes a misdemeanor of the third degree offense, punishable by a fine and imprisonment of not more than one year.

A true and correct copy of the Self-Inspection Affidavit executed by Defendant Parisi on behalf of RHA and dated November 14, 2007, is attached as Exhibit I hereto and incorporated herein by reference.

55.    Defendant Parisi executed the Self-Inspection Affidavit on RHA's behalf attesting and affirming that all of the Code violations existing at the River House Apartments had been corrected as of November 14, 2007.  *See* Exhibit I.

56.    Prior to Closing, RHA provided REVA with a copy of the Self-Inspection Affidavit affirming that all existing Code violations had been rectified.

57.    Prior to Closing, Defendant Korman also provided to REVA correspondence from the Codes Bureau, dated December 10, 2002, as additional evidence that the River Plaza Apartments complied with all applicable codes, ordinances and regulations.  A true and correct copy of correspondence from David E. Patten, Codes Administrator with the Codes Bureau, dated December 10, 2002, is attached as Exhibit J hereto and incorporated herein by reference.

58    Contrary to the affirmative representations included within the Self-Inspection Affidavit and other representations and warranties made by RHA, Korman and Parisi, REVA discovered shortly after Closing that numerous Code violations remained and that very few, if any, of the Code violations identified in the Inspection Report had been corrected.

59.     Given the extent of the remaining Code violations, REVA requested that the Codes Bureau conduct another inspection to determine the extent of RHA's failure to correct the violations.  A true and correct copy of REVA's request to the Codes Bureau, dated February 14, 2008, is attached as Exhibit K hereto and incorporated herein by reference.

60.     Parisi was present at the re-inspection conducted by the Codes Bureau and admitted that RHA had failed to correct many of the existing Code violations.

61.     On February 28, 2008, the Codes Bureau again inspected the River Plaza Apartments and found that numerous Code violations remained uncorrected.

62.     By letter dated March 19, 2008, the Codes Bureau informed RHA that it had failed to correct a substantial number of the Code violations listed in the Inspection Report.  A true and correct copy of the March 19, 2008 letter from the Codes Bureau to Defendant Korman is attached as Exhibit L hereto and incorporated herein by reference.

63.     Given the number and magnitude of the remaining Code violations and given Parisi's knowledge of the remaining Code violations as demonstrated during the re-inspection, the Codes Bureau concluded that RHA, through Parisi, had knowingly executed and filed a false Self-Inspection Affidavit.  *See* Exhibit L.

64.     Parisi, as RHA's regional property manager, had actual and intimate knowledge of the Code violations and poor physical condition of the River Plaza Apartments.

65.     Further, as demonstrated during the February 28, 2008 re-inspection, Parisi knew that many, if not all, of the violations noted in the Inspection Report had not been remedied and that additional Code violations existed in units which had not been inspected by the Codes Bureau.

66.     Despite this knowledge, Parisi knowingly executed the Self-Inspection Affidavit falsely representing that all such violations had been corrected.

67.     RHA, Parisi and Korman then provided the Self-Inspection Affidavit to REVA knowing and intending that REVA would rely on the false representations and attestations made therein.

68.     To its detriment, REVA relied on the intentional misrepresentations made by RHA, Parisi and Korman with respect to the remediation of the existing Code violations at the River Plaza Apartments.

69.     Since Closing, REVA has been forced to incur significant costs to address all of the remaining Code violations existing at the River Plaza Apartments which RHA failed and/or refused to correct.  To date, the costs incurred by REVA

to correct the Code violations total approximately Three Hundred Twenty-seven

Thousand One Hundred Sixty-eight Dollars ($327,168).

70.     RHA, as owner of the River House Complex, had actual knowledge of

the Code violations noted in the Inspection Report and the other existing Code

violations.

71.     Korman, as an officer of RHA, and Parisi, as RHA's Regional

Property Manager, also had actual knowledge of the Code violations existing at the

River Plaza Apartments as of the date of Closing.

72.     Instead of informing REVA of the Code violations, RHA, Korman

and Parisi misrepresented to REVA that the River Plaza Apartments were in good

physical condition and compliant with all applicable codes.

### RHA's Failure to Disclose The CentiMark Report and Other Notes Documenting the Poor Latent Condition of the Roof

73.     RHA represented and warranted in Section 5(o) of the Purchase

Agreement that no latent defects existed on the River Plaza Apartments.

74.     The Purchase Agreement defines a latent defect as "a material defect

of which [RHA] has knowledge but which cannot be discovered during an

investigation of the [River Plaza Apartments]."  *See* Exhibit A; Section 5(o).

75.     Further, Section 7(a)(v) of the Purchase Agreement required RHA to

disclose and provide copies of, *inter alia*, any inspection reports in RHA's

possession or control which related to the physical condition or operation of the River Plaza Apartments. *See* Exhibit A, Section 7(a)(v).

76.    Despite these obligations, RHA misrepresented the condition of the roof and RHA, Korman and Parisi intentionally withheld from REVA a report prepared by CentiMark, a roofing specialist (the "CentiMark Report"), which was in their possession and which detailed the poor and defective condition of the roof.

77.    In an attempt to gain as much information as possible prior to Closing, and unaware of the existence of the CentiMark Report, REVA undertook appropriate due diligence including, without limitation, engaging Houck Services, Inc. ("Houck") to conduct an inspection of the roof.

78.    Houck specializes in the maintenance and repair of roofs for commercial properties.

79.    Houck conducted a comprehensive inspection of the roof of the River Plaza Apartments in July, 2007 and issued a detailed report containing its conclusions (the "Houck Roof Report"). A true and correct copy of the Houck Roof Report is attached as Exhibit M hereto and incorporated herein by reference.

80.    Because Houck's inspection of the roof was conducted as part of REVA's due diligence review, it did not include any invasive testing methods, such as core samples, which would cause damage to the roof.

81.    While appropriate for due diligence purposes, non-invasive roof inspection of the type performed by Houck is unlikely to uncover latent defects that cannot be discovered by inspecting the surface of the roof.

82.    The Houck Roof Report noted that the roof was in fair condition overall and indicated minor deficiencies in the roof which required remediation. Houck included a quote for Eleven Thousand Five Hundred Sixty-five Dollars ($11,565) to correct the deficiencies.  *See* Exhibit M.

83.    In August, 2007, REVA notified RHA of the deficiencies noted in the Houck Roof Report and the cost required to remedy such deficiencies.

84.    At Closing, RHA and Korman reaffirmed that they were unaware of any defects with regard to the roof.  *See* Exhibit A, Certificate attached as Exhibit I to Purchase Agreement.

85.    Subsequent to Closing, REVA discovered that RHA, through Parisi, had prior to Closing, removed from the premises all records pertaining to the maintenance and operation of the River Plaza Apartments.

86.    RHA, Korman and Parisi, intentionally removed these records in an attempt to conceal their knowledge of the existing Code violations, the latest defective condition of the roof (*i.e.*, the CentiMark Report) and other material defects existing at the River Plaza Apartments.

87.     REVA later discovered theretofore undisclosed maintenance records

(the "Maintenance Notes") referring to substantial and persistent problems with the

roof.  True and correct copies of the Maintenance Notes are attached as Exhibit N

hereto and incorporated herein by reference.

88.     Specifically, the Maintenance Notes reflected persistent roof leaks in

Units #1218 and #1219 and documented several various unsuccessful attempts to

correct the problem over the course of 4 years, from February, 1999 through

March, 2003.

89.     Neither RHA nor Korman disclosed to REVA the Maintenance Notes,

or their contents.  Further, RHA and Korman actively concealed other relevant

maintenance and/or operational notes and records pertaining to the River Plaza

Apartments.

90.     On January 10, 2008, less than two weeks after Closing, REVA

discovered roof leaks in apartment 1218 and the elevator room.

91.     The leaks in the roof discovered by REVA were in the same location

as those identified and discussed in the Maintenance Notes.

92.     REVA then discovered that RHA had previously engaged CentiMark

to conduct an inspection of the roof of the River Plaza Apartments in October,

2006.

93.     Following the inspection in October, 2006, RHA received a copy of the CentiMark Report which concluded that the entire roof was in "very poor" condition.  A true and correct copy of the CentiMark Report, dated October 12, 2006, is attached hereto as Exhibit O, and incorporated herein by reference.

94.     The CentiMark Report noted leaks throughout several sections of the roof and suggested the full replacement of certain sections of the roof.

95.     CentiMark stated that the defects in the roof would cost approximately Two Hundred Eighteen Thousand Seven Hundred Forty-two Dollars ($218,742) to correct.

96.     RHA, Korman and Parisi intentionally withheld from REVA their knowledge of the CentiMark Report and withheld their knowledge regarding the poor condition of the roof.

97.     RHA, Korman and Parisi intentionally withheld from REVA the CentiMark Report and other relevant information in order to induce REVA to purchase the River Plaza Apartments.

98.     RHA, Korman and Parisi had actual knowledge of the CentiMark Report and its conclusions, but withheld such information from REVA.

99.     After Closing, when confronted by REVA, Korman pointedly denied the existence of the CentiMark Report until REVA presented Korman with a copy of the report.

100.   Because REVA did not learn of the existence of the CentiMark Report until after Closing, REVA was unaware of the severity of the latent defects existing on the roof.

101.   As a result of the severity of the latent roof defects, REVA was forced to incur costs totalling approximately Two Hundred Twenty Thousand Dollars ($220,000) to replace the defective sections of the roof.

102.   Further, as a result of the pervasive leaks caused by the existing and substantial defects in the roof and the subsequent replacement thereof, REVA was unable to rent approximately twenty-eight (28) units, including six (6) of the penthouse units.

103.   As a result, in addition to the costs incurred to fix the defective roof, REVA incurred damages in the form of the lost rental income totalling approximately One Hundred Sixty-four Thousand Dollars ($164,000).

**RHA'S Misrepresentations Regarding the Fire Alarm System**

104.   While under its control, RHA employed a "watch desk" fire alarm system at the River Plaza Apartments which required constant monitoring by an attendant.

105.   Under the "watch desk" fire alarm system, smoke detectors located throughout the complex reported alerts to the fire-alarm panel located on the first floor.

106.   Following an alarm, an attendant would physically investigate the floor where the alarm sounded.

107.   If the attendant determined that an actual fire or some other dangerous situation existed, the attendant would manually pull the audible fire alarms located on each floor to notify the residents of the building.

108.   The effectiveness of this type of watch-desk system is entirely dependant on the continuous presence of an attendant.

109.   If an attendant is not present, the entire system is rendered unsafe and ineffective because there is no way to notify the residents of the existing danger.

110.   Prior to Closing, REVA discovered that a fire occurred at the River Plaza Apartments in September of 2007 (the "September Fire").

111.   REVA also discovered that there was no attendant present when the Harrisburg Fire Department (the "Fire Department") arrived at the River Plaza Apartments on the night of the September Fire.

112.   RHA's failure to have an attendant present caused an extremely dangerous situation where residents of the River Plaza Apartments were unaware of the fire until Fire Department personnel arrived and manually pulled the alarms on each floor.

113.   The Fire Department personnel also learned: (a) that the elevators did not function properly because they did not return to the first floor upon the

activation of the fire alarm system; and (b) that no audible fire alarms existed on the 8th, 9th and 10th floors of the complex.  A true and correct copy of an email, dated September 17, 2007, from David Eiceman, an official with the Fire Department, regarding the September Fire is attached as Exhibit P hereto and incorporated herein by reference.

114.   A watch-desk fire alarm system complies with the Fire Code only if it is constantly and properly monitored by attendants.

115.   Such attendants must be adequately trained and familiar with the system in order to ensure that the system is effective in the event of a fire.

116.   While REVA discovered some information regarding the September Fire prior to Closing, it did not discover other material information pertaining to the fire alarm system.

117.   REVA later discovered that, following the September Fire, RHA admitted that it had failed to constantly monitor the system.  RHA blamed its failures on "staffing shortages."

118.   REVA also discovered after Closing that RHA represented to and agreed with the City of Harrisburg ("City") and the Fire Department that it would upgrade the fire alarm system to ensure the safety of the residents of the River House Apartments.

119.   Unbeknownst to REVA, following the September Fire, the Fire Department required that the fire alarm system be continuously monitored by multiple attendants until the necessary upgrades had been completed.

120.   RHA, Korman and Parisi intentionally failed to disclose to REVA its agreement with the City and the Fire Department to upgrade the fire alarm system and the Fire Department's mandate that multiple attendants were required to monitor the system.

121.   In October, 2007, RHA obtained a quote from Vector Security (the "Vector Quote") of the costs necessary to implement the agreed-upon upgrades to the fire alarm system.  A true and correct copy of the Vector Quote is attached as Exhibit Q hereto and incorporated herein by reference.

122.   The Vector Quote reflected a total cost of Fifty-three Thousand Dollars ($53,000) to implement the upgrades.

123.   Prior to Closing, RHA failed to disclose to REVA the costs associated with the upgrades it agreed to implement.

124.   Despite its agreement with the City to address the unsafe fire alarm system, RHA failed to make the improvements necessary to implement the upgrades.

125.   RHA also failed to address the defective elevators and the inoperative audible fire alarms on the 8th, 9th, and 10th floors of the River Plaza Apartments.

126.   RHA's failure to address these issues violated the Fire Code and violated clear directives of the City and the Fire Department.

127.   After Closing, in addition to discovering RHA's failure to upgrade the fire alarm system, REVA also discovered that RHA gave untrained tenants discounts on their rent if they agreed to monitor the fire alarm system.

128.   Upon information and belief, none of the tenants selected by RHA had any technical training and/or experience with operating the watch-desk fire alarm system.

129.   Upon information and belief, RHA, through Parisi, directed that these arrangements be made with certain tenants.

130.   Post-Closing, REVA discovered RHA's arrangement only after a tenant notified REVA of the arrangement and requested a refund of a portion of rent as payment for monitoring the fire alarm system.

131.   REVA also discovered several other tenants with whom RHA had similar arrangements.

132.   Prior to Closing, RHA, Korman and Parisi did not disclose to REVA its arrangement with its tenants.

133.   The monitoring of the watch-desk fire alarm system by untrained individuals violated the Fire Code, and placed the residents of the River Plaza Apartments in danger.

134.   RHA's failure to disclose to REVA the Fire Department's standing orders to fix the elevator and audible fire alarms, as well as the Fire Code violations, was intentional and breached RHA's disclosure obligations under the Purchase Agreement.

135.   RHA's failure to disclose its financial arrangement with its tenants was also contrary to RHA's representations in connection with the Purchase Agreement.

136.   While RHA provided what it represented to be a true and correct copy of the rent roll for the River Plaza Apartments (the "Rent Roll"), the Rent Roll it provided did not reflect the financial arrangements with its tenants.

137.   Likewise, the Operating Statement provided by RHA did not mention or reflect the financial arrangements with its tenants.

138.   RHA intentionally withheld this information to fraudulently induce REVA to enter into the Purchase Agreement and proceed with Closing.

139.   As a result of RHA's, Korman's and Parisi's failure to disclose and affirmative misrepresentations regarding the fire alarm system and the issues required to be addressed following the September Fire, REVA was faced with a number of Fire Code violations and other extremely unsafe conditions.

140.   To remedy the illegal and dangerous condition caused by the outdated and incorrectly implemented fire alarm system, REVA engaged Pulsar Alarm

Systems ("Pulsar") to complete the upgrades to the fire alarm system which RHA had agreed, but failed, to accomplish.

141.    As a direct result of RHA's, Korman's and Parisi's fraud REVA incurred costs totalling approximately Sixty-six Thousand Four Hundred Dollars ($66,400) to complete the upgrades necessary to make the fire alarm system safe and effective.

142.    Pulsar began the upgrades to the fire alarm system in January, 2008.

143.    REVA also terminated RHA's arrangements with the tenants and engaged the Wackenhut Corporation ("Wackenhut"), a private security firm, to monitor the fire alarm system while the upgrades were taking place.

144.    Wackenhut personnel were on duty at the River Plaza Apartments prior to and during Pulsar's completion of the upgrades.

145.    Several false alerts occurred while Pulsar was upgrading the system. False alerts of this type are typical during the completion of such upgrades.

146.    Unaware that the alarm was caused by Pulsar's work; a Wackenhut employee contacted the Fire Department and requested them to investigate a possible fire.

147.    Once on scene, the Fire Department checked the River Plaza Apartments and determined that it was a false alarm.

148.   While there, the Fire Department re-checked the operation of the fire alarm system and determined that the audible fire alarms on the 8th, 9th, and 10th floors remained inoperative.

149.   For the first time, REVA learned that the Fire Department previously ordered RHA to address the inoperative audible alarms.

150.   REVA also learned that RHA had been ordered to increase the number of attendants to monitor the fire alarm system until the upgrades were completed.

151.   Specifically, REVA was informed that the Fire Department required one attendant for every 2 floors of the River Plaza Apartments.

152.   RHA, Korman and Parisi never disclosed to REVA the Fire Department's order to provide one attendant for every two floors.

153.   REVA immediately complied with the Fire Department's orders and hired additional Wackenhut employees to monitor the fire alarm system.

154.   In addition, REVA contacted Pulsar and requested that they expedite the implementation of the upgrades to the fire alarm system.

155.   Pulsar provided additional manpower to complete the job on an expedited basis.  A true and correct copy of a Change Order issued by Pulsar, reflecting the additional costs associated with the expedited service and additional manpower is attached as Exhibit R hereto and incorporated herein by reference.

156.   REVA incurred substantial additional costs in expediting the completion of the upgrades.

157.   RHA, Korman and Parisi had actual knowledge of the September Fire, the malfunctioning elevators, the defective audible fire alarms, and the Fire Department's order to remedy these deficiencies.

158.   RHA, Korman and Parisi also had actual knowledge of the Fire Department's requirement for additional attendants throughout the River Plaza Apartments.

159.   RHA's, Korman's and Parisi's intentional failures to disclose such information constitute a pattern of deception aimed at fraudulently inducing REVA to enter into the Purchase Agreement and to complete Closing.

## RHA's Numerous Breaches of the Purchase Agreement

160.   In addition to being fraudulent, RHA's, Korman's and Parisi's intentional omission of material information and affirmative misrepresentations regarding the physical condition and operation of the River Plaza Apartments breached RHA's disclosure obligations and its representations made under the Purchase Agreement.

161.   Specifically, as an inducement to and in consideration for REVA to enter into the Purchase Agreement, RHA represented and warranted to REVA:

(a)     that it had received no notice advising of any violation of building codes or other local, state or federal law or regulations (*See* Exhibit A, Section 5 (c));

(b)     that the income and expense reports were true and correct (*See* Exhibit A, Section 5(d));

(c)     that all copies of contracts, leases and other agreements were complete, true and correct (*See* Exhibit A, Section (f)); and

(d)     that it had no knowledge of any material defects which could not be discovered during an investigation of the River Plaza Apartments (*See* Exhibit A, Section 5(o)).

162.   RHA was further obligated to provide additional information, including:

(a)     copies of all inspection reports regarding the River Plaza Apartments (*See* Exhibit A, Section 7(a)(v));

(b)     copies of all outstanding management, leasing, maintenance, repair and/or service agreements (*See* Exhibit A, Section 7(a)vii)); and

(c)     copies of all leases with the tenants of River Plaza Apartments (*See* Exhibit A, Section 7(a)(viii)).

163.   Section 17 of the Purchase Agreement, regarding indemnification, provides in relevant part, as follows:

(a)     [RHA] hereby agrees to indemnify, hold harmless and defend [REVA] and any successor in interest (the "Indemnified Parties") from and against:

(i)     any loss, liability or damage suffered or incurred by the Indemnified Parties because any misrepresentations or warranty made by [RHA] in this [Purchase] Agreement was incorrect in any material respect or as a result of any legal action filed against [REVA] as a

result of events arising at the [River House Complex] prior to the Closing and not caused by [REVA]; and

(ii)     all costs and expenses (including reasonable attorneys' fees and disbursements) incurred by the Indemnified Parties in connection with any action, suit, proceeding, demand, assessment or judgment, incident to any of the matters indemnified against in this Section 17(a).

*See* Exhibit A, Section 17(a).

164.   The Purchase Agreement further provides that all representations and warranties made by RHA: (a) were renewed as of the date of closing; and (b) would survive for a period of six (6) months after Closing.  *See* Exhibit A, Section 5, p. 10.

165.   RHA's disclosure obligations to REVA continued after the execution of the Purchase Agreement up through and including Closing.

166.   Specifically, the Purchase Agreement required that until Closing RHA would "promptly notify [REVA] of any change in any condition . . . or any event or circumstance which makes any representation or warranty of [RHA] to [REVA] materially untrue or misleading . . .".  *See* Exhibit A, Section 9(i).

167.   Prior to Closing, representatives of REVA spoke with Korman and Parisi on many occasions.  During that time, between the signing of the Purchase Agreement and Closing, Korman and Parisi intentionally failed to inform REVA: (a) that latent defects existed in the roof; (b) of the existence of extensions of the

Coinmach Lease and Kone Contract; (c) of the City's and Fire Department's orders regarding the fire alarm system and related unsafe conditions; and (d) of the continuing code violations existing at the River Plaza Apartments.

168.   REVA also discovered that during and throughout the due diligence process, RHA, through Korman and Parisi, directed its employees to be vague in answering any of REVA's questions concerning the physical condition of River Plaza Apartments.

169.   RHA's directives to its employees, made through Korman and Parisi, were made to conceal from REVA RHA's knowledge of the poor overall condition of the River Plaza Apartments and breached RHA's obligations under the Purchase Agreement to disclose such information.

170.   REVA's reliance upon Korman's and Parisi's obligations to disclose such information on RHA's behalf was justified because RHA specifically authorized Korman and Parisi to speak on its behalf.

171.   Section 5 of the Purchase Agreement specifically defines "[Seller's] knowledge" and "to the knowledge of Seller" as referring to "the actual knowledge of Kathy Parisi, Regional Property Manager, and Bradley Korman."

172.   As REVA continued to discover misrepresentations made by and other actions taken by Korman and/or Parisi, RHA's, Korman's and Parisi's intent to omit and/or misrepresent to REVA material facts became clear.

173.   In light of those omissions and misrepresentations, by letter dated March 18, 2008, REVA put RHA on notice of its claims as set forth hereinabove. A true and correct copy of the March 18, 2008 notice is attached as Exhibit S hereto and incorporated by reference.

## COUNT I
### Real Estate Value Advisors, LLC, et al v. River House Associates, LP and West Rittenhouse Management Company, LLC
### Fraudulent Misrepresentation

174.   Paragraphs 1 through 173 are incorporated herein by reference as if set forth in full.

175.   In entering into the Purchase Agreement and proceeding with Closing thereunder, REVA justifiably and reasonably relied to its detriment on the representations and warranties contained in the Purchase Agreement, which representations and warranties were material, false and misleading, and known by RHA and, its general partner, WRMC to be false and misleading.

176.   As a result of these misrepresentations, and the material omissions stated in paragraphs 17, 20, 27, 35-36, 42, 58, 67, 70, 72-73, 76, 84, 86, 88, 95-97, 120, 123, 132, 134, 136-137, 139, 152, and 157-159, above, REVA entered into the Purchase Agreement and proceeded with Closing thereunder, which it would not have done but for RHA's and/or its agents' intentional misrepresentations and omissions.

177.   RHA's and/or its agents' material omissions and affirmative misrepresentations were part of a scheme and pattern of conduct devised by RHA, Korman and Parisi and intended to defraud REVA.

178.   As a direct result of RHA's and/or its agents' intentional omissions and affirmative misrepresentations, REVA has incurred substantial unexpected costs, and will have to incur further substantial costs in the future to assess and remedy the serious Code violations, Fire Code violations, latent defects and other unsafe conditions which existed at the River Plaza Apartments as of Closing.

179.   At all times relevant, WRMC, as RHA's general partner, authorized and approved RHA's material omissions and affirmative misrepresentations made to REVA under the Purchase Agreement and otherwise.

180.   RHA's and/or its agents' material omissions and affirmative misrepresentations regarding the River Plaza Apartments were intentional, willful, wanton, outrageous and in reckless disregard for REVA's legal rights and/or the safety of the tenants of the River Plaza Apartments.

WHEREFORE, Plaintiffs, REVA River Plaza, LLC, *et al.*, demand judgment against the Defendant, River House Associates, LP, in an amount in excess of $500,000, plus interest, costs of suit and punitive damages as allowed by law.

## COUNT II
## REVA River Plaza, LLC, et al. v. Bradley J. Korman
### Fraudulent Misrepresentations

181.   Paragraphs 1 through 180 are incorporated herein by reference as if set forth in full.

182.   In entering into the Purchase Agreement and proceeding with Closing thereunder, REVA justifiably and reasonably relied to its detriment on the representations and warranties contained in the Purchase Agreement, which representations and warranties were material, false and misleading, and known by Korman to be false and misleading.

183.   The Purchase Agreement provided that representations and warranties made based upon RHA's knowledge were made based specifically on Korman's actual knowledge or lack thereof.

184.   As a result of Korman's material omissions and affirmative misrepresentations, stated in paragraphs 27, 35, 58, 67, 71-72, 76, 84, 86, 89, 96-98, 120, 132, 134, 139, 152, and 157-159 above, REVA entered into the Purchase Agreement and proceeded with Closing thereunder, which it would not have done but for Korman's intentional misrepresentations and omissions.

185.   Korman's material omissions and affirmative misrepresentations were part of a scheme and pattern of conduct devised by RHA, Korman and Parisi intended to defraud REVA.

186.   As a direct result of Korman's intentional omissions and affirmative misrepresentations, REVA has incurred substantial unexpected costs, and will have to incur further substantial costs in the future to assess and remedy the serious Code violations, Fire Code violations, latent defects and other unsafe conditions which existed at the River Plaza Apartments as of Closing.

187.   At all times relevant, Korman had actual knowledge of the condition and operation of the River Plaza Apartments and was well aware of the existence of the Code violations, Fire Code violations, latent defects and other unsafe conditions existing at the River Plaza Apartments as of and prior to Closing.

188.   Korman's material omissions and affirmative misrepresentations regarding the River Plaza Apartments were intentional, willful, wanton, outrageous and in reckless disregard for REVA's legal rights and/or the safety of the tenants of the River Plaza Apartments.

WHEREFORE, Plaintiffs, REVA River Plaza, LLC, *et al.*, demand judgment against the Defendant, Bradley J. Korman, in an amount in excess of $500,000, plus interest, costs of suit and punitive damages as allowed by law.

## COUNT III
### REVA River Plaza, LLC, et al. v. Kathy Parisi
### Fraudulent Misrepresentations

189.   Paragraphs 1 through 188 are incorporated herein by reference as if set forth in full.

190.   In entering into the Purchase Agreement and proceeding with Closing thereunder, REVA justifiably and reasonably relied to its detriment on the representations and warranties contained in the Purchase Agreement, which representations and warranties were material, false and misleading, and known by Parisi to be false and misleading.

191.   The Purchase Agreement provided that representations and warranties made based upon RHA's knowledge were made based specifically on Parisi's actual knowledge or lack thereof.  See Exhibit A, Section 5, p. 10.

192.   As a result of Parisi's material omissions and affirmative misrepresentations, stated in paragraphs 58, 61, 65-67, 71-72, 76, 86, 89, 96-98, 120, 132, 134, 139, 152, and 157-159 above, REVA entered into the Purchase Agreement and proceeded with Closing thereunder, which it would not have done but for Parisi's intentional misrepresentations and omissions.

193.   Parisi's material omissions and affirmative misrepresentations were part of a scheme and pattern of conduct devised by RHA, Korman and Parisi and intended to defraud REVA.

194.   As a direct result of Parisi's intentional omissions and affirmative misrepresentations, REVA has incurred substantial unexpected costs, and will have to incur further substantial costs in the future to assess and remedy the serious

Code violations, Fire Code violations, latent defects and other unsafe conditions which existed at the River Plaza Apartments as of Closing.

195.   At all times relevant, Parisi had actual knowledge of the condition and operation of the River Plaza Apartments and was well aware of the existence of the Code violations, Fire Code violations, latent defects and other unsafe conditions existing at the River Plaza Apartments as of and prior to Closing.

196.   Parisi's material omissions and affirmative misrepresentations regarding the River Plaza Apartments were intentional, willful, wanton, outrageous and in reckless disregard for REVA's legal rights and/or the safety of the tenants of the River Plaza Apartments.

WHEREFORE, Plaintiffs, REVA River Plaza, LLC, *et al.*, demand judgment against the Defendant, Kathy Parisi, in an amount in excess of $500,000, plus interest, costs of suit and punitive damages as allowed by law.

## COUNT IV
### Real Estate Value Advisors, LLC, et al. v. River House Associates, LLC, Bradley J. Korman and Kathy Parisi
### Civil Conspiracy

197.   Paragraphs 1 through 196 are incorporated by reference as though set forth at length herein.

198.   RHA, Korman and Parisi engaged in a scheme and pattern of conduct with the common purpose of defrauding REVA and inducing REVA to enter into the Purchase Agreement and proceed to Closing thereunder.

199.   RHA, Korman and Parisi had an obligation under the law and Purchase Agreement to completely and truthfully disclose to REVA material facts regarding the condition and operation of the River Plaza Apartments.

200.   As more fully set forth in paragraphs 17, 35-36, 86-89, 96-98, 120, 123, 132, 134, 139, 152, and 157-159 above, RHA, Korman and Parisi intentionally failed to disclose to REVA material facts regarding the condition and operation of the River Plaza Apartments.

201.   As more fully set forth in paragraphs 20, 27, 42, 58, 61, 65-67, 70-71, 76, 84, 136-137, and 139 above, RHA, Korman and Parisi also made affirmative misrepresentations to REVA regarding the condition and operation of the River Plaza Apartments.

202.   These material omissions and affirmative misrepresentations were at all times relevant known by RHA, Korman and Parisi to be false and/or misleading.

203.   Further, these material omissions and affirmative misrepresentations were made by RHA, Korman and Parisi for the purpose of inducing REVA to enter into the Purchase Agreement and proceed with Closing at an inflated purchase price.

204.    REVA suffered substantial and unexpected additional costs as a result of RHA's, Korman's and Parisi's scheme to withhold material information regarding the condition and operation of the River Plaza Apartments.

205.    Likewise, REVA suffered substantial and unexpected additional costs as a result of RHA's, Korman's and Parisi's scheme to affirmatively misrepresent material information regarding the condition and operation of the River Plaza Apartments.

WHEREFORE, Plaintiffs, REVA River Plaza, LLC, *et al.*, demand judgment against Defendants, River House Associates, LP, Bradley J. Korman and Kathy Parisi, in an amount in excess of $500,000, plus interest, costs of suit and punitive damages as allowed by law.

## COUNT V
### REVA River Plaza, LLC, et al., v. River House Associates, LP and West Rittenhouse Management Company, LLC
### Breach of Contract/Representations and Warranties

206.    Paragraphs 1 through 205 are incorporated by reference as though set forth at length herein.

207.    REVA has fully complied with its contractual obligations to RHA under the Purchase Agreement.

208.    Under the Purchase Agreement, RHA, by and through its general partner, WRMC, and its agents, Korman and Parisi, made several representations and warranties to REVA as more fully set forth in Paragraph 207 above.

209.   In the alternative to Counts I through IV above, involving RHA's, Korman's and Parisi's multiple intentional misrepresentations regarding the physical condition of the River Plaza Apartments, RHA, through its general partner, WRMC, and its agents, Korman and Parisi, breached the Purchase Agreement by all of the following:

(a)   knowingly and intentionally misrepresenting the status, validity and terms of the Coinmach Agreement as more fully set forth in Paragraphs 17, 20-22, and 27 above;

(b)   knowingly and intentionally misrepresenting the status, validity and terms of the Block Agreement as more fully set forth in Paragraphs 17, 20-22, and 42 above;

(c)   knowingly and intentionally misrepresenting that as of Closing no Code violations existed at the River Plaza Apartments as more fully set forth in Paragraphs 58, 61, 65-67, and 70-72 above;

(d)   knowingly and intentionally misrepresenting the condition of the roof of the River Plaza Apartments as more fully set forth in Paragraphs 76 and 84 above;

(e)   knowingly and intentionally misrepresenting the veracity of the Rent Roll as more fully set forth in Paragraph 136 above;

(f)   knowingly and intentionally misrepresenting the veracity of the Operating Statement as more fully set forth in paragraph 137 above;

(g)   knowingly and intentionally misrepresenting that it had no knowledge of any directives from governmental authorities regarding the fire alarm system as more fully set forth in Paragraph 1-38 and 157-159 above.

210.   As the general partner of RHA, WRMC is also liable to REVA for the misrepresentations made to REVA under the Purchase Agreement.

WHEREFORE, Plaintiffs, REVA River Plaza, LLC, et al., demand judgment against Defendants, River House Associates, L.P. and West Rittenhouse Management Company, LLC, in an amount in excess of $500,000, plus interest, costs of suit and attorneys' fees, as allowed by law and permitted under the Purchase Agreement.

**COUNT VI**
**REVA River Plaza, LLC, et al. v. River House Associates, L.P.**
**and West Rittenhouse Management Company, LLC**
**Breach of Contract/Failure to Disclose**

211.    Paragraphs 1 through 210 are incorporated by reference as though set forth at length.

212.    REVA has fully complied with its contractual obligations to RHA under the Purchase Agreement.

213.    In the alternative to Counts I-IV, above, involving RHA's, Korman's and Parisi's numerous failures to disclose material information pertaining to the physical condition of and operation of the River Plaza Apartments, RHA, through its general partner, WRMC, and its agents, Korman and Parisi, breached the Purchase Agreement by all of the following:

(a)    failing to disclose to REVA the existence and terms of the Coinmach Extension as more fully set forth in Paragraphs 17 and 30-36 above;

(b)    failing to disclose to REVA the existence and terms of the Kone Contract as more fully set forth in Paragraphs 44-48 above;

(c)     failing to disclose to REVA the existence and contents of the Maintenance Notes as more fully set forth in Paragraphs 87-89 above;

(d)     failing to disclose to REVA the existence and contents of the CentiMark Report as more fully set forth in Paragraphs 92-100 above;

(e)     failing to disclose to REVA RHA's agreement with the City and the Fire Department to upgrade the fire alarm system at the River Plaza Apartments as more fully set forth in Paragraphs 118-124 above;

(f)     failing to disclose to REVA RHA's agreement with its tenants a reduced rental rate to such tenants for monitoring the fire alarm system as more fully set forth in Paragraphs 127-133 and 135-138 above;

(g)     failing to disclose to REVA directives made by the Fire Department to RHA prior to Closing requiring multiple attendants to be assigned to monitor the fire alarm system until the upgrades were completed as more fully set forth in Paragraphs 151, 152, and 156-158 above.

214.   As the general partner of RHA, WRMC is also liable to REVA for the failures to disclose to REVA the material information listed in Paragraphs 213(a)-(g) above.

## COUNT VII
### REVA River Plaza, LLC, et al. v. River House Associates, L.P. and West Rittenhouse Management Company, LLC
### Breach of Contract/Failure to Disclose

215.   Paragraphs 1 through 214 are incorporated by reference as though set forth at length.

216.   REVA has fully complied with its contractual obligations to RHA under the Purchase Agreement.

217.   In the alternative to Counts I-IV, above, involving RHA's, Korman's and Parisi's numerous failures to disclose material information pertaining to the physical condition of and operation of the River Plaza Apartments, RHA, through its general partner, WRMC, and its agents, Korman and Parisi, breached the Purchase Agreement by all of the following:

(a)    failing to disclose to REVA the existence and terms of the Coinmach Extension as more fully set forth in Paragraphs 17 and 30-36 above;

(b)    failing to disclose to REVA the existence and terms of the Kone Contract as more fully set forth in Paragraphs 44-48 above;

(c)    failing to disclose to REVA the existence and contents of the Maintenance Notes as more fully set forth in Paragraphs 87-89 above;

(d)    failing to disclose to REVA the existence and contents of the CentiMark Report as more fully set forth in Paragraphs 92-100 above;

(e)    failing to disclose to REVA RHA's agreement with the City and the Fire Department to upgrade the fire alarm system at the River Plaza Apartments as more fully set forth in Paragraphs 118-124 above;

(f)    failing to disclose to REVA RHA's agreement with its tenants a reduced rental rate to such tenants for monitoring the fire alarm system as more fully set forth in Paragraphs 127-133 and 135-138 above;

(g)    failing to disclose to REVA directives made by the Fire Department to RHA prior to Closing requiring multiple

attendants to be assigned to monitor the fire alarm system until the upgrades were completed as more fully set forth in Paragraphs 151, 152, and 156-158 above.

218.   As the general partner of RHA, WRMC is also liable to REVA for the

failures to disclose to REVA the material information listed in Paragraphs 217(a)-

(g) above.

DATED:  July 28, 2008          HARTMAN UNDERHILL & BRUBAKER, LLP


By:  /s/ Brett D. Jackson, Esquire
     Kevin M. French, Esquire
     PA ID #47589
     Brett D. Jackson, Esquire
     PA ID #87517

     221 East Chestnut Street
     Lancaster, PA   17602
     Phone:  717/299-7254

     Attorneys for Plaintiff, REVA River Plaza, LLC